[Cite as *Lucero v. Ohio Dept. of Rehab. & Corr.*, 2010-Ohio-5907.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ARTURO LUCERO

    Plaintiff

    v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, et al.

    Defendants
    Case No. 2008-08019

Judge Clark B. Weaver Sr.
Magistrate Matthew C. Rambo

MAGISTRATE DECISION

{¶ 1}  Plaintiff brought this action alleging negligence.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}  At all times relevant, plaintiff was an inmate in the custody and control of defendants pursuant to R.C. 5120.16.  On August 29, 2007, inmate Caldwell approached plaintiff as he sat on his bunk on the second floor of the Chillicothe Correctional Institution (CCI) housing unit F-2 talking to inmate Cruz and asked plaintiff if he wanted to trade some beans for some rice.  Plaintiff declined the offer and asked Caldwell to leave, at which time Caldwell punched plaintiff in the face.  Plaintiff responded by pushing Caldwell, who then left the area.  Plaintiff then removed his "shower shoes" and put on his tennis shoes so as to be better equipped to defend himself should Caldwell return.  Caldwell returned several minutes later and cut plaintiff in the face with a sharpened lid from an aluminum can, inflicting a six-inch laceration extending from the left side of plaintiff's mouth along his jaw line.  Plaintiff shoved Caldwell, turned away from him, and Caldwell cut him on the back with the lid.  Plaintiff

swung an empty five-gallon bucket at Caldwell, who turned and ran.        Plaintiff testified that after the attack, he used a towel to apply pressure to the wound on his face, went downstairs, and reported the incident to Corrections Officer (CO) Pettit. Plaintiff estimated that between five and ten minutes elapsed between the attack and when he reported to Pettit.  According to plaintiff, Pettit called the infirmary, infirmary medical staff "checked him out" and sent him to a hospital outside of the institution for treatment.

{¶ 3}   In order for plaintiff to prevail upon his claim of negligence, he must prove by a preponderance of the evidence that defendants owed him a duty, that defendants' acts or omissions resulted in a breach of that duty, and that the breach proximately caused his injuries.  *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 81, 2003-Ohio-2573, citing *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77.  Ohio law imposes upon the state a duty of reasonable care and protection of its prisoners; however, the state is not an insurer of inmate safety.  *Williams v. Southern Ohio Correctional Facility* (1990), 67 Ohio App.3d 517, 526.

{¶ 4}   Defendants are not liable for the intentional attack on one inmate by another unless it had adequate notice, either actual or constructive, of an impending attack.  *Mitchell v. Ohio Dept. of Rehab. & Corr.* (1995), 107 Ohio App.3d 231, 235. The distinction between actual and constructive notice is in the manner in which notice is obtained rather than in the amount of information obtained.  Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual.  Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice.  *In re Estate of Fahle* (1950), 90 Ohio App. 195, 197.

{¶ 5}   Plaintiff testified that he was familiar with Caldwell from living in F-2 with him.  According to plaintiff, Caldwell stole from other inmates and was "trouble" generally.  Plaintiff stated that the inmates in F-2 often fought and argued and that he

had wanted to move out of F-2 prior to being attacked by Caldwell. To that end, plaintiff testified that he sent a "kite" to Unit Sergeant Christman, on August 17, 2007, wherein he requested that he be moved to another housing unit because he and Caldwell "almost got into a fight." (Plaintiff's Exhibit 1.) The document offered into evidence by plaintiff was a photocopy, not the original kite. Although it appears that Christman signed it, plaintiff stated that he did not receive a response to the kite. Plaintiff further testified that he had not had any physical altercation with Caldwell before August 29, 2007, only arguments and disagreements. Even so, plaintiff argues that the kite should have put defendants on notice of an impending attack by Caldwell.

{¶ 6} CO Nathan Pettit testified that he was assigned as a "second shift" CO in F-2 at the time of the incident. Pettit stated that his shift started at 2:00 p.m. and ended at 10:00 p.m. According to Pettit, F-2 is a dormitory style housing unit that houses approximately 280 inmates on two floors. Pettit stated that the unit has bunk beds arranged in rows in one large room on each floor and that the inmates are permitted to move freely about the room and between the two floors. Pettit testified that one other CO is on duty with him during the second shift and that when "rounds" are made, one CO checks the first floor and the other checks the second, although occasionally one CO would check both floors. According to Pettit, the purpose of "rounds" is to ensure the safety and security of the inmates.

{¶ 7} Pettit testified that he was on duty with CO Dale Jones on the day of the incident, and that they made several rounds prior to the incident and had no warning that Caldwell would attack plaintiff. A copy of the relevant page of the F-2 log book from the day of the incident shows that Pettit made rounds at 2:14 p.m., 2:39 p.m., and 3:07 p.m., that Jones made rounds alone at 3:31 p.m. and that, at 3:41 p.m., plaintiff reported to the CO desk and was bleeding. (Defendants' Exhibit A.)

{¶ 8} Christman testified that he was the corrections sergeant normally stationed in F-2 during the same time of the incident, but was not working on the day that it occurred. Christman described the institutional "kite" system as follows: an

inmate obtains and fills out a kite form, folds it, and seals it like an envelope; the inmate gives the kite to a CO or other staff member, who then signs the kite and places it in the "kite box"; the kites are sorted by a staff member and placed in the relevant staff mailboxes for delivery; the kites are delivered to the relevant offices and staff members and stamped "received"; the kites are logged into a ledger, and then forwarded to the proper staff members for disposition.

{¶ 9}   Christman testified that the kite in question in this case, Plaintiff's Exhibit 1, does not contain either a signature showing that it was delivered to a staff member for placement in the kite box, or a stamp showing that it was "received" by Christman or any other staff member.   Christman further testified that it was not his signature that appears on the kite, and he denied ever seeing the kite prior to trial.   Christman could tell the signature was not his because of the way the "t" in "Christman" was crossed, and that it looked like a forgery.   Christman further stated that had he received such a kite, he would have begun an investigation into the problems between plaintiff and Caldwell and notified his superiors.

{¶ 10} Plaintiff called Ray Fraley to testify as to the authenticity of the signature on the kite in question.   Fraley testified that he was employed as a document examiner by the Columbus Police Department from 1962-1983, and that he had provided expert testimony in over 3,000 cases in Columbus and the surrounding area.   Fraley stated that his training included classes and seminars at the United States Secret Service Academy, the United States Postal Inspector Lab, and the University of Louisville.

{¶ 11} Evid.R. 702 provides:

{¶ 12} "A witness may testify as an expert if all of the following apply:

{¶ 13} "(A)                    The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ 14} "(B)                     The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 15} "(C)                     The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

{¶ 16} "(1)                     The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

{¶ 17} "(2)                     The design of the procedure, test, or experiment reliably implements the theory;

{¶ 18} "(3)                     The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶ 19} Additionally, "[i]t is a well settled rule in this state that, where the genuineness of handwriting is involved, well attested standards of the hand of the person whose writing is in question may be introduced for the purpose of comparison with that which is disputed; and that this comparison may be made, not only by persons who have seen the party write, or have acquired a knowledge of his hand by corresponding or transacting business with him, but also by persons skilled in handwriting, such as are usually called experts." *Bell v. Brewster* (1887), 44 Ohio St. 690, 696.

{¶ 20} Based upon his testimony, the court is convinced that Fraley is qualified to testify as an expert in handwriting and document examination.

{¶ 21} Fraley was provided with 15 of Christman's signatures to compare with the signature on Plaintiff's Exhibit 1; 12 of which he described as "suitable" for examination and comparison. Fraley testified that based upon angle and letter formation, he identified ten points of similarity between the examples and the signature in question.

Based upon his examination, Fraley opined that the signature on Plaintiff's Exhibit 1 was that of Christman.  Fraley stated that the fact that the exhibit is a copy does not matter in this type of examination.

{¶ 22} However, Fraley acknowledged that a signature can lose its original characteristics when it is copied.  When asked if it was possible that Plaintiff's Exhibit 1 was created by cutting Christman's signature from another document and pasting it on the kite and then making the copy, Fraley stated that it was possible, but that he could see no evidence of such a creation.  Similarly, when asked if the signature could be a forgery, Fraley stated that he had "no knowledge" of a possible forgery.  In explaining the differences between the "t" in "Christman" on the signature on Plaintiff's Exhibit 1 and the examples as pointed out by Christman, Fraley stated that he considered such a difference to be within the "normal variance" that can be present in an individual's signature.

{¶ 23} Despite Fraley's testimony, the court is not persuaded that the signature on Plaintiff's Exhibit 1 is that of Christman.  Moreover, the document does not contain any of the normal indicia to establish that it progressed through the CCI kite process described by Christman.  Thus, the court finds that defendants did not have notice, either actual or constructive, that Caldwell was going to attack plaintiff.  Accordingly, the court finds that defendants are not liable for the injuries plaintiff sustained as a result of the attack by Caldwell.

{¶ 24} Based upon the foregoing, judgment is recommended in favor of defendants.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual*

*finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
MATTHEW C. RAMBO
Magistrate

cc:

Eric A. Walker
Paula Luna Paoletti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

MR/cmd
Filed November 10, 2010
To S.C. reporter December 1, 2010